1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH I. DEANE,

                        Plaintiff,

        v.

PACIFIC FINANCIAL GROUP
INC, et al.,

                        Defendants.

CASE NO. C19-722 MJP

ORDER ON CROSS-
MOTIONS FOR
PARTIAL SUMMARY
JUDGMENT

The above-entitled Court, having received and reviewed:

1.  Defendants' Motion for Partial Summary Judgment (Dkt. No. 64), Plaintiff's

    Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment

    (Dkt. No. 74), Defendants' Reply in Support of Defendants' Motion for Partial

    Summary Judgment (Dkt. No. 82);

2.  Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 68), Defendants'

    Opposition to Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 72),

    Plaintiff's Reply in Support of Motion for Partial Summary Judgment (Dkt. No. 80);

1    all attached declarations and exhibits, and relevant portions of the record, rules as follows:

2         IT IS ORDERED that Defendants' motion is DENIED.

3         IT IS FURTHER ORDERED that Plaintiff's motion is PARTIALLY GRANTED

4    (dismissal of the counterclaim for tortious interference and a portion of the counterclaim for

5    "Breach of Contract, Duty of Loyalty, Confidentiality") and PARTIALLY DENIED (dismissal

6    of a portion of Defendants/Counterclaimants' Prayer for Relief).

7                                    **Background**

8         Plaintiff went to work for Defendant The Pacific Financial Group ("TPFG"), a national

9    investment firm, in 2007.  He worked his way up in responsibility and salary until he had

10   oversight authority for the company's operations in the eastern half of the United States.

11        In June 2018, Plaintiff was notified by Defendants Meade and Scalzo (then co-CEOs of

12   TPFG) that a reorganization was being considered for the company.  As part of the process of

13   reorganizing, the following was proposed by email (to Plaintiff and his counterpart in the

14   Western U.S.):

15        In an effort to move in this direction, however, we have come to an
16        agreement to terminate Scott Friel in his existing role and hence
          activating the Employment Protection Contract, using 10% of the net
17        revenue of his territory, per the contract, starting July 1, 2018. We
          have subsequently rehired him in the new marketing role and he is
18        staying on with the firm.

19        As for you two...we tremendously value your efforts over the years to
          help grow our firm, and as such we'd like to reward you far it. So, in
20        order to build this firm in the manner described above and to reward
          our best guys-you- we are exercising the same provision with you two,
21        also beginning July 1, 2018. You will receive 16 quarterly payments,
          funded by 10% of the net revenue of your respective territories, per
22        your contracts, OR we would like to offer you equity ownership in the
          firm ***HIGHLY CONFIDENTIAL *** , should you choose to move
          permanently into the above mentioned roles. That equity is fully
23        dilutable, dividend-paying, class III stock in Pacific Holdings, LLC. It
          is stock that has a buyout formula of 2X the growth in book value from

24

1
2
3

the time of the grant to the time the firm exercises its right, not obligation, to buy you out upon separation of service for any reason (quit or fired, with or without cause). Of course, we hope for you to stay. If there is ever a liquidity event, it is fully participating equity, again, with dividends all along the way.

4
5

Please note: If you take the equity, you forego the cash buyout and the contract is terminated. If you don't take the equity, we are buying you out and we can sit down negotiate your future role with the firm.

6   Dkt. No. 70, 3rd Declaration of Deane, Ex. 2.  The email gave Plaintiff 5 days to indicate

7   "which way you want to go."  Id.

8          Plaintiff did not accept the offer within the timeframe indicated.  A series of

9   discussions ensued concerning proposals for Plaintiff's role in the company.  None of them

10  were successful at arriving at a meeting of the minds.  On November 15, 2018, Defendant

11  Meade sent the following email to Plaintiff:

12
13
14

I'm disappointed that you're not interested in the deal we offered you. A 5% fully dividend paying equity partnership, base compensation at approximately $440K in a fruitful territory, and a Global Initiatives role, tackling some of the most important initiatives of the firm, is a more than generous offer.

15
16
17

As a result, I want you to take a month off and go explore the space. If you indeed find a better offer, as much as that would disappoint me, I'd have to wish you well. If after reflecting on this offer, you'd like to accept, I'd love to continue to have you as part of the team.

18  3rd Decl. of Deane, Ex. 4.

19          Plaintiff did in fact take a month off, and used the time to connect with various

20  potential employers, one of whom (Advisors Capital Management; "ACM") he later

21  accepted a job with.  By late December, Plaintiff had decided that the best course for him

22  was to accept Defendants' offer of a cash buyout.  He emailed them on December 26, 2018,

23  to convey his decision:

24

> Thank you for your most recent proposal for continuing my
> employment at Pacific. After considerable thought and personal
> reflection I have decided that it is time to trigger the cash buyout
> provision of my employment agreement as referenced in your June 15,
> 2018 email and again more recently as we have been discussing
> possible alternative scenarios. Let me know how you want to work out
> the details of this transition .
>
> It has been one of the greatest pleasures and satisfactions of my life
> working with/for you to build TPFG over the past eleven years; I thank
> you for the opportunity, trust. investment and autonomy which led to
> one of the greatest success stories in our Industry .

Id., Ex. 3.  Plaintiff was advised that, as of January 22, 2019, TPFG was terminating him

from its employment (the email was written to Plaintiff's attorney):

> Given we are not in agreement with your requirement of stipulation
> and have not received a counteroffer to our proposals, TPFG is
> terminating Ken's employment effective January 22, 2019. Since Ken
> has engaged counsel, we feel it best at this stage to communicate
> through you and appreciate you conveying this decision to Ken. In
> accordance with the terms of the employment agreement, TPFG will
> pay Ken his 16 quarterly payments. Please remind Ken that per the
> employment agreement, he is subject to confidentiality and is not to
> disparage TPFG, solicit its clients, advisers, employees etc., or to
> otherwise interfere with its business. Any such activity will be deemed
> a breach of the contract.

Dkt. No. 69, 2nd Declaration of Rosen, Ex. 1.  Despite Defendants' stated disagreement that

Plaintiff was entitled to the buyout payments, Defendants began to make the termination

payments.  However, they were less than Plaintiff expected because the two sides differed

on the interpretation of language related to the termination payment provision in the

Employment Agreement.

Following his termination, Plaintiff's negotiations with ACM continued, resulting in

an employment agreement with the company in early July 2019.  Plaintiff's discussions with

TPFG to resolve their differences over his termination payments broke down two months

1  prior to that, and in May 2019 he instituted this lawsuit, alleging breach of contract and

2  willful withholding of wages (RCW 49.52.050) and requesting an accounting and a

3  declaratory judgment.  Dkt. No. 1.  Defendants have counterclaimed; following the filing of

4  an amended answer and counter-complaint, their allegations include breach of contract and

5  duty of loyalty, confidentiality, and non-solicitation; tortious interference; and constructive

6  resignation.  Dkt. No. 58.

7  **Standard of Review**

8  "The court shall grant summary judgment if the movant shows that there is no genuine

9  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

10  Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving

11  party fails to make a sufficient showing on an essential element of a claim in the case on which

12  the nonmoving party has the burden of proof.  Celotex Corp. v. Catrett, 477 U.S. 317, 323

13  (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could not

14  lead a rational trier of fact to find for the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith

15  Radio Corp., 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant

16  probative evidence, not simply "some metaphysical doubt."); Fed. R. Civ. P. 56(e).  Conversely,

17  a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed

18  factual dispute, requiring a judge or jury to resolve the differing versions of the truth.  Anderson

19  v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T.W. Elec. Service Inc. v. Pacific Electrical

20  Contractors Association, 809 F.2d 626, 630 (9th Cir. 1987).

21

22

23

24

1

**Discussion**

2

Plaintiff's Motion for Partial Summary Judgment[1]

3      Plaintiff attacks three aspects of Defendants' counterclaims (two of the counterclaims and

4    a portion of the prayer for relief requesting termination of any further financial obligation to

5    Plaintiff).

6          *Breach of contract, duty of loyalty and confidentiality*

7      Plaintiff's motion is *very* specifically targeted regarding this counterclaim; he asserts:

8    "Plaintiff is entitled to summary judgment on defendant TPFG's counterclaims for breach of the

9    provision in the employment agreement prohibiting him from communicating confidential

10   information to third parties."   Dkt. No. 68, Plaintiff Motion at 13.

11     The Court agrees: having reviewed every document cited by Defendants as "proof" that

12   confidential information was communicated to third parties, even viewing the evidence in the

13   light most favorable to the non-moving party, there is no evidence to support that claim.  Plaintiff

14   is entitled to a ruling that, as a matter of law, Defendants have not supported that portion of their

15   allegations.

16     Defendants point out that the "Confidentiality" provision of Plaintiff's Employment

17   Agreement also states:

18       Employee acknowledges and agrees that all such Confidential
         Information, including, without limitation, that which Employee conceives
19       or develops, either alone or with others, at any time during his
         employment by Employer, is and shall remain the exclusive property of
20       Employer and upon termination of Employee's employment, no tangible
         form of such information or copies shall  be retained by Employee in any
21       form.

22

23

[1] Plaintiff originally moved for dismissal of Affirmative Defenses 1 – 8 asserted by Defendants.  Defendants, in their
response, withdrew those affirmative defenses, rendering that portion of Plaintiff's motion moot.

24

Dkt. No. 58, Answer and Counterclaim, ¶ 8.7.  Defendants have evidence that Plaintiff emailed himself (from his work email to his personal email) a number of items of arguably confidential information: contact information for other employees, TPFG's self-directed brokerage accounts ("SDBA's"), and a breakdown of TPFG's Assets Under Management ("AUM's") by region.  Dkt. No. 66, Declaration of Demmon, Ex. F.

Plaintiff makes no response to this argument in his reply brief, but the Court feels constrained to point out that his summary judgment request is very narrowly tailored to target only that portion of Defendants' counterclaim alleging that confidential information was communicated to third parties.  It is that portion of the counterclaim which is dismissed as a result of this ruling; the issue of whether Plaintiff breached his duty of confidentiality with the material he emailed to himself awaits resolution on another day.

*Tortious interference*

The elements of this tort consist of:

1. A contract or "business expectancy"
2. Knowledge of the relationship or business expectancy
3. "Intentional interference inducing or causing a breach or termination of the relationship or expectancy"
4. Damage resulting from the interference

Calbom v. Knudtzon, 65 Wn.2d 157, 162-63 (1964).  Defendants, despite their claim that Plaintiff has "repeatedly induced and attempted to induce termination of TPFG's business" (Dkt. No. 72, Response at 14), fail to produce evidence in support of this claim which establishes either intentional interference or damages.

The evidence cited by Defendants which they claim as proof of Plaintiff's "interference" is generic and conclusory, lacking in any direct references probative of an attempt to interfere or dissuade a client of Defendants' from doing business with the company.  In the case of the

declaration of a former business associate of Plaintiff's (Dkt. No. 67, Declaration of McInnis, ¶¶ 4-8), the evidence (while it contains allegations that Plaintiff solicited money from the declarant to underwrite a business venture, an allegation Plaintiff denies) again contains no references to any direct, overt or explicit attempt by Plaintiff to interfere in the declarant's business relations with TPFG[2]; not even the highly non-specific allusion to "derogatory comments" about co-Defendant Meade (id. at ¶ 7) contains references to any statement the effect of which was to "induce or cause a breach or termination of the relationship or expectancy."

The Court will grant Plaintiff's request for summary judgment dismissing the counterclaim of tortious interference.

### Dismissal of portion of Defendants' prayer for relief

A portion of Defendants' prayer for relief requests that the Court "reliev[e] Defendant TPFG from any further financial obligations to Plaintiff under the Employment Agreement." Answer/Counterclaim at 16. Plaintiff makes the leap of logic that this request is made on the basis that he is alleged to have violated the "non-solicitation" clause of his Employment Agreement. That rationale appears nowhere in the "Prayer for Relief" (or elsewhere in the Answer) and Plaintiff provides no explanation for how he arrived at his conclusion.

Defendants explain in their response that the request to relieve them of further payments to Plaintiff is based on a counterclaim that Plaintiff does not attack in his motion; namely, Defendants' claim that Plaintiff constructively resigned. Although Plaintiff attempts to argue in his reply brief that there is "substantial evidence" to reject the constructive resignation claim, this

---

[2] The most pointed observation the declarant can make is to opine that "[t]he implication was that he wanted [declarant's company] to move TPFG clients to ACM." Id. at ¶ 6. The declarant's speculation about what might have been implied by a comment of Plaintiff's is not evidence.

1   assertion is completely outside the scope of his motion and will be disregarded.  The portion of

2   Plaintiff's summary judgment seeking dismissal of this prayer for relief will be denied.

3

4   Defendants' Motion for Partial Summary Judgment

5         Defendants seek summary judgment on three issues: (1) their counterclaim of

6   "constructive resignation," (2) their interpretation of the meaning of the term "procured" in their

7   Employment Agreement with Plaintiff, and (3) their counterclaim that Plaintiff breached his

8   duties of loyalty, confidentiality and non-solicitation.   Defendants fail to produce the requisite

9   evidence to satisfy the summary judgment standard of sufficient nondisputed material facts to

10  entitle them to judgment as a matter of law.

11        *Constructive resignation*

12        "Constructive resignation" is a doctrine applied to a situation where "an employee has a

13  choice of either complying with a reasonable requirement or terminating employment.  If the

14  employee refuse[s] to comply, the employer may consider the refusal an election to quit."  Govier

15  v. North Sound Bank, 91 Wn.App. 493, 504 (1998).

16        Govier cited earlier California employment case Steinberg v. Unemployment Ins. Appeals

17  Bd., 87 Cal.App.3d 582 (1978), for the elements of the tort:

18

19        "A claimant is said to have constructively quit his job when, although discharged by
          the employer, the claimant  himself set in motion the chain of events which resulted in the
          employer's *having no choice except to terminate him.*

20        "*All three of the following elements must be present before it can be said that a claimant
          has constructively quit his job*.

21

22        "1. *The claimant voluntarily committed an act which*

23        "2. *made it impossible for the employer to utilize his services*, and

24

ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT - 9

1    "3. *the claimant knew or reasonably should have known the act would jeopardize his job*
2    *and possibly result in the loss of his employment*." (Italics in original.)

3    Id. at 585 (quoting from Employment Development Department, Benefit Determination Guide, at
4    VQ 135.14-1 (1976)).

5         Defendants cite as "facts" in support of their right to summary judgment on this
6    counterclaim that Plaintiff (a) "refused" reassignment to a different territory and a new
7    employment agreement and (b) "resigned" via email and then reneged on the resignation.  Both
8    allegations are riddled with disputed issues of material fact.

9         Plaintiff was indisputably reassigned to a different territory; his area of authority/operation
10    was reduced from the entire eastern half of the United States to the states of New York and
11    Florida.  Dkt. No. 66-1, Ex. B.  There is no direct evidence that he refused the reassignment;
12    Defendants claim that his lack of activity while in that new role constituted a refusal, while
13    Plaintiff asserts that he was performing his new duties and "awaiting instructions" from his
14    supervisor.  Dkt. No. 76, 4th Declaration of Deane, Ex. 13.  Defendants attempt to characterize
15    Plaintiff's "activity log" as Plaintiff simply sitting there, "awaiting instructions," but the log states
16    that he was returning calls and emails to clients in his new territory, an assertion that goes
17    unchallenged in Defendants' briefing.

18         There is a factual dispute as to whether Plaintiff was performing his reassigned duties or
19    rendering it impossible for his employer to utilize his services.   Defendants have no evidence
20    substantiating their claim that Plaintiff "refused" his reassignment or was totally inactive
21    following his reduction in responsibility.  This issue is simply not ripe or appropriate for summary
22    judgment.

23

24

1    As for Defendants' claim that Plaintiff "resigned," that too is simply another set of

2    disputed facts which a factfinder will need to resolve.  The December 2018 email Defendants cite

3    as proof does read as though Plaintiff believes their relationship is coming to an end, but (viewing

4    it in the light most favorable to the non-movant) it appears clear that he believes that the

5    relationship is ending under the terms proposed by Defendants back in June; i.e., the "buy-out"

6    via termination payments.  Defendants argue that, legally, he is incorrect that the June offer was

7    still valid,[3] but that is irrelevant for purposes of ascertaining his intent at the end of December.

8    Plaintiff argues, convincingly, that he knew what it would mean if he resigned (i.e., the forfeiture

9    of lucrative termination payments) and he had no intention of walking away from those payments

10   by resigning.

11    Plaintiff tries to make much of paperwork completed by the company at the conclusion of

12   his employment which characterizes the end of that employment as an "involuntary termination."

13   Dkt. No. 75, Exs. 3 and 4.  Defendants claim that the characterization in those documents favors

14   their position.  Frankly, since neither side bothers to explain what the term "involuntary

15   termination" means – is it "involuntary" on the part of the employer or the employee?? – the

16   Court finds that, for purposes of this motion, the document benefits neither of their positions.

17    However, the Court does agree with Plaintiff on one further point – the fact that

18   Defendants in fact did begin making termination payments to Plaintiff (albeit payments he

19   maintains were improperly calculated) two months after they terminated his employment

20   mitigates in favor of Plaintiff's position that TPFG did not consider him to have "resigned" such

21

22   [3] Both parties touch briefly on the issue of whether the June offer was still operative at the time that the six-month
negotiations broke down, but the battle is never fully joined on the legal argument and the Court is not required to

23   decide it here.  Since the termination payments contemplated in the Employment Agreement look identical to the
"buy-out" discussed in the June email, the issue of the ongoing validity of the June offer need not be decided for

24   purposes of analyzing these motions.

1   that their obligation to make the payments was extinguished.[4]  While not definitive at this point, it

2   is evidence favoring Plaintiff's argument that summary judgment is inappropriate.

3          Thus, disputed issues of material fact requiring resolution by a finder of fact and

4   unresolved legal issues dictate denial of summary judgment on this counterclaim.

5          *The meaning of the term "procure"*

6          Plaintiff's Employment Agreement states that he will receive as termination payments

7   "the quarterly management fees earned and collected by employer from investor clients *procured*

8   by the employee in the territory during employee's employment."  Dkt. No. 66-1, Ex. F at ¶¶ 4-

9   5.(emphasis supplied.)

10         Defendants and Plaintiff have very different ideas of the meaning of the word "procured."

11  Defendants would restrict the term to apply only to sales in territory assigned to Plaintiff in which

12  no other "wholesalers" (the name for sales agents in this business) were involved, and which were

13  entered into and serviced by Plaintiff himself.  Plaintiff believes that he is "entitled to the fees

14  generated from the various advisors I procured, or obtained for TPFG over the period of my

15  employment."  Dkt. No. 76, 4th Decl. of Deane, ¶ 42.  "Advisors" refers to "financial advisors

16  who were the pipeline for investor clients."  Dkt. No. 77, Declaration of Friel, ¶ 4.

17         Plaintiff is seeking (through his lawsuit) a ruling that any account (i.e., "investor client")

18  which resulted from a referral from a financial advisor whose first contact with TPFG came

19  through Plaintiff, even though the investor client may have contacted or been contacted by a

20  "wholesaler" working in Plaintiff's territory who then serviced the account, would be considered

21  to have been "procured" by Plaintiff and counted towards the calculation of his termination

22

23  [4] This conclusion is bolstered by the language of Defendants' termination letter: "*In accordance
    with the terms of the employment agreement*, TPFG will pay Ken his 16 quarterly payments."

24  2nd Rosen Decl., Ex. 1.(emphasis supplied.)

1  payment.  Defendants attempt to characterize his claim as an entitlement to all management fees

2  generated by all wholesalers in his territory; Plaintiff states definitively that is not his position,

3  and the Court does not read his arguments that way, either.

4        The dictionary definition of "procure" is not particularly useful: "to obtain by particular

5  care and effort."  Merriam Webster Dictionary, 11th ed. (2003).  Additionally, however, there is a

6  doctrine which is utilized in real estate law and in cases where there is no written contract called

7  the "procuring cause" doctrine.  Both sides agree that, while not controlling, it is "instructive."

8        The "procuring cause" in a sales transaction is defined as the person who "sets in motion a

9  series of events culminating in a sale."  Miller v. Paul M. Wolff Co., 178 Wn.App. 957, 963-64

10  (2014).  Where more than one person is involved in the sale, the doctrine looks to the "originating

11  cause, which ultimately led to the conclusion of the transaction," as the "procuring cause."

12  Spencer v. Backus, 1992 U.S. App. LEXIS 30770 at *8 (9th Cir. Nov. 16, 1992).

13        It is the finding of the Court that the definition of "procuring cause," as well as the Backus

14  case, favors Plaintiff's position far more than Defendants'.  Under Plaintiff's scenario, it was his

15  initial contact with the financial advisors who then steered their investor clients to invest their

16  funds in TPFG offerings that "set[] in motion a series of events culminating in a sale."  The

17  "wholesalers" are thus more like "closers" who finalize the transaction that Plaintiff's initial

18  contact set in motion.

19        Defendants trumpet the analysis in Backus as though it conclusively proves their point –

20  the Court believes they completely misread the case.  Backus involved an initial agreement

21  between a landowner (Backus) and a real estate broker (Spencer) wherein, in exchange for the

22  preparatory work of getting the property rezoned and improved and marketing its availability, the

23  broker was guaranteed a certain percentage of the sale price.   Spencer was approached by another

24

broker (Finney) about a buyer; the two worked together to close the sale but that deal never

materialized.  Then Finney was contacted by a third broker about a client who eventually ended

up making a qualifying offer on the property.  Again, Finney and Spencer both worked on

securing the sale, but the property owner argued that Finney was the "procuring cause" and thus

Spencer was not eligible for the agreed-upon compensation.

     The trial court disagreed, and was affirmed by the Ninth Circuit.  While acknowledging

that both Spencer and Finney "played important roles in procuring the bona fide offer," the

appellate court found that

> [I]t was Spencer who rezoned the property, made improvements, marketed
> the property, and worked with Finney to successfully negotiate a bona fide
> offer. There is substantial evidence in the record to support the trial court's
> finding that Spencer procured the bona fide offer.

<u>Backus</u>, *supra* at *11.

     Defendants argue that Plaintiff is "Finney" in their scenario; the Court finds this a tortured

analogy at best.  Plaintiff, in those situations where he laid the initial groundwork for the account

by contacting and cultivating the relationships with the financial advisors who ultimately referred

the client investors, seems clearly to be the "Spencer" in the current circumstance.  The "boots on

the ground" wholesalers who received the (secondary) client investor contacts and worked up the

contracts leading to the accounts, are the "Finneys."  If Plaintiff had never wooed and won the

financial advisors, convincing them their clients would be well-advised to do business with

TPFG, the client investors would never have contacted the wholesalers; thus Plaintiff appears to

be the "procuring cause" under the doctrine.

     Again, Defendants have not established their right to summary judgment as a matter of

law on this issue, and summary judgment will be denied.

1

2          _Breach of duties of loyalty, confidentiality, and non-solicitation_

3          This portion of Defendants' motion suffers from the same proof problems identified in

4   Plaintiff's motion.  Defendants claim that Plaintiff:

5          1.   Developed a "joint venture" with ACM intended to compete directly with TPFG while

6               still working for the company.

7          2.   Used "confidential knowledge" developed at TPFG in the creation of the joint venture.

8          3.   Solicited TPFG clients to cease doing business with the company and invest their

9               funds in his new employer, ACM.

10

11         Defendants present almost zero concrete evidence of any of these claims.  The evidence

12  which they do present is either disputed (contradicted by Plaintiff) or does not (when viewed in

13  the light most favorable to Plaintiff) establish their claims that he breached any duty to his old

14  employer.

15         Three examples suffice to make the point:

16  •   In November 2018, after five months of unsuccessful negotiations for a new position

17      within TPFG, Plaintiff was instructed by Defendant Meade to take a month off and

18      "explore the space."  No one defines that amorphous term, but at the very least it was

19      permission for Plaintiff to inquire about other job possibilities outside of TPFG.  Which he

20      did – it is unrealistic for TPFG to expect that those discussions with other employers

21      would not include hypotheticals about what kind of work they would do together

22      (precisely the light in which Plaintiff casts the "joint venture" that Defendants discuss as

23      though it began draining off their business from its inception, when in fact it has not been

24

1    launched to this day[5]) and it is hyperbole to characterize – without direct evidence – such

2    discussions as breaches of a duty of loyalty.  Neither is it realistic nor convincing to argue

3    that the fact that those discussions continued past the 30-day mark from Defendant

4    Meade's invitation constitutes evidence of disloyalty; even without the permission of

5    one's superiors, an employee may inquire about other job opportunities without triggering

6    violations of a duty of loyalty, and Defendants cite no authority to the contrary.

7    • One of Defendants' key witnesses regarding solicitation is a client of TPFG's named

8      Brian McGinnis, who is discussed *supra* in relation to Plaintiff's motion.  (*See* Dkt. No.

9      67, Declaration of McGinnis.)  McGinnis was invited to a "Due Diligence conference"

10     (who issued the invitation is a disputed issue of material fact) put on by ACM in late

11     March/early April 2019.  He describes being introduced by Plaintiff to a principal in

12     ACM, David Lieberman, and then asserts that "Mr. Lieberman discussed the size and

13     success of S&P [*McGinnis's company*].  He also discussed the potential Self-Directed

14     Brokerage Account ("SDBA") markets."  McGinnis goes on to declare that "[a]t some

15     point I had a conversation with Mr. Lieberman about S&P contributing to the SDBA

16     fund."  Id. at ¶¶ 4-5. While all these allegations are clearly intended to *insinuate*

17     something underhanded and nefarious, there is not a single *direct* allegation that this

18     witness was solicited to terminate his company's relationship with TPFG or that what he

19     was discussing involved direct competition with TPFG.  Viewed in the light most

20

21

22

23   [5] Defendants also acknowledge in their briefing that courts have distinguished between "mere preparation to
     compete" and acts which violate duties of loyalty and confidentiality.  Unfortunately, they do not *cite* any of those
     cases, but even the mere fact that they acknowledge their existence points to the legal reality that not every inquiry
24   into other job options is a betrayal of one's current employer.

favorable to Plaintiff, the Court finds that a jury or factfinder could reasonably adjudge this behavior to be non-tortious.[6]

- Plaintiff points to the absence of proof of any damages from all his alleged double-dealing.  Defendants counter with case law acknowledging that violations of non-solicitation and confidentiality agreements can result in "intangible injuries;" loss of reputation and goodwill, etc.  Without denying that legal reality, the Court nevertheless takes note of the fact that, in the 18+ months since Plaintiff's departure, Defendants have not produced evidence of a *single* client going over to Plaintiff's new employer, or produced data reflecting a dip in income in some formerly-profitable area of their enterprise in which ACM or Plaintiff supposedly competes with them.  The lack of evidence supporting Defendants' counterclaim that Plaintiff breached any duty to them speaks much louder than any evidence they have produced; what evidence they do have falls short of the standard required for a grant of summary judgment.

A combination of disputed facts and failures of proof dictate denial of this portion of Defendants' summary judgment motion as well.  The Court will note that, in their reply brief, Defendants attempt to raise the issue of Plaintiff's transfer of TPFG information to himself just prior to his departure as a breach of his duty of confidentiality.  This issue was not raised in their opening brief, however, thus depriving Plaintiff of any opportunity to respond.  It may not be raised for the first time in Defendants' reply.

---

[6] McGinnis further alleges that Plaintiff solicited a $200 million contribution from him to seed Plaintiff's own SBDA funds with ACM (Id. at ¶ 6), an allegation which Plaintiff flatly denies (commenting, among other things, that the $200 million figure is absurd because he would have needed less than $100,000 to start such a fund).  Dkt. No. 76, 4th Decl. of Deane at ¶ 32.

**Conclusion**

Plaintiff has met his burden in regard to establishing his entitlement, as a matter of law, to summary judgment on Defendants' counterclaim for tortious interference and on the limited issue of the absence of any evidence that he violated his duty of confidentiality by transmitting confidential information to third parties. His request for dismissal of the portion of Defendants' prayer for relief related to the curtailment of further payments to him will be denied on the grounds that he mis-identified the basis for Defendants' request.

Defendants' motion for partial summary judgment on two of their counterclaims, as well as their request for a declaratory ruling as regards the interpretation of the term "procured" vis-à-vis Plaintiff's termination payments, is denied. The evidence they have produced in support of that request fails to satisfy the standard required for a grant of summary judgment.

The clerk is ordered to provide copies of this order to all counsel.

Dated September 28, 2020.

Marsha J. Pechman
United States Senior District Judge