UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KENNETH I DEANE,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC FINANCIAL GROUP INC,<br>MEGAN P MEADE, NICHOLAS B<br>SCALZO, EVA M SCALZO, JAMES C<br>MCCLENDON, JOAN A<br>MCCLENDON, GAETAN T SCALZO,<br>SHERRIE SCALZO,<br><br>Defendants. | CASE NO. C19-722 MJP<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

This matter, having been tried before the Court without a jury, and the Court having reviewed all the evidence and heard all the testimony makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

**A.    Parties**

1.    Plaintiff Kenneth I. Deane (Deane) is a resident of the State of Florida.

2.      Defendant The Pacific Financial Group (TPFG) is a registered investment advisor engaged in the business of providing investment advisory and money management services. A Washington for-profit corporation, TPFG was founded in 1984 by defendant James McClendon (McClendon).

3.      Defendants Megan Meade (Meade), Nicholas Scalzo, and Gaetan Scalzo are all officers of TPFG.

4.      Defendant McClendon and Meade are residents of the State of Washington. Nicholas Scalzo and Gaetan Scalzo are each residents of the State of California.

5.      Until late 2016 TPFG was owned by McClendon and Meade. In 2016, McClendon, Meade, Nicholas Scalzo, and Gaetan Scalzo formed a limited liability company organized under the laws of the State of Washington called Pacific Holdings Group, LLC. All four defendants became managing directors of the Pacific Holdings Group and officers of TPFG. Pacific Holdings Group, LLC also owned ProTools, LLC, which had been owned by the Nicholas Scalzo and Gaetan Scalzo.

**B.      The Employment Agreement**

6.      Deane and TPFG entered into a valid and enforceable written employment agreement effective October 1, 2007 (Employment Agreement).

7.      Under the terms of the Employment Agreement Deane was to perform the duties of a sales representative or "wholesaler" for TPFG. His territory included twenty-six states in the eastern part of the United States, including the District of Columbia. A wholesaler sells the financial products to financial advisors and brokers, who then use the products to help clients manage their financial portfolios. Deane and TPFG agreed that Deane would be paid according to the commission schedule as set forth in Schedule A to the Employment Agreement.

8.      The commission schedule was amended at different times during Deane's employment.

9.      When the Parties entered into the Employment Agreement, Deane was the only wholesaler, and he was compensated based on revenue in his territory only. As TPFG grew, wholesalers were added, and Deane became a division manager, overseeing a team of wholesalers servicing his territory. As division manager, and in accordance with Schedule A of the Employment Agreement, Deane was compensated based on the fees earned and collected in the territory he managed, excluding the continued payment on accounts already in existence when the territory was assigned to him as a wholesaler or when a new state or region was assigned to his territory.

10.     Deane's duties evolved from that of a wholesaler to becoming a member of the executive team overseeing a team of wholesalers hired by TPFG to advance the company's growth.

11.     The Employment Agreement contains a provision that allowed either party to terminate the agreement upon fourteen days' notice to the other party.

12.     The Employment Agreement also contained a provision that in the event Deane was terminated without cause or for "any other reason not listed under the termination for cause provision" of the Employment Agreement, Deane would continue to receive commissions for up to a four year period depending on the length of his employment. The Employment Agreement then set forth a methodology for Deane to receive any such commissions, the amount of which was based on the business he "procured" for TPFG during this period of employment.

13.     Deane and Meade had discussions and agreed that the termination payments would be based on the assets under management (AUM) in Deane's territory over and above the amounts existing on October 1, 2007 when Deane began his employment with TPFG.

14.     While the Employment Agreement was heavily negotiated, Meade and Deane did not discuss the meaning of the word "procured" in the agreement.

15.     The Employment Agreement required Deane to perform his duties as directed by TPFG.  It also required that Deane comport himself in accordance with his duty of loyalty to TPFG, which included a "Devotion of Full Time to Employment," a duty to not act in a way that would harm TPFG's business, and a duty to maintain in confidence TPFG's confidential information.

16.     TPFG's confidential information includes "information not generally known to the general public relating to the business of [TPFG]," including investment methods, business information, investor client lists, and corporate marketing plans and procedures among others. Deane's obligations were to preserve the confidentiality of TPFG's confidential information.

17.     Deane agreed to a non-solicitation provision, which provides that for a period of twelve months following his employment, he must not:

> (1) directly or indirectly, solicit the services of any . . . investor clients of [TPFG] with the purpose of causing such persons to terminate their . . . business relationship with [TPFG]; or (2) induce any custodians, consultants, or referral sources or any other business relation of [TPFG] to cease doing business with [TPFG] or in any way interfere with the relationship between [TPFG] and its custodians, consultants, and referral sources. . . .

18.     The parties understood that the maintenance of confidentiality and non-solicitation were "essential elements of [the] Agreement, and that, but for the agreement of

1  [Deane] to comply with such covenants, [TPFG] would not have agreed to enter into [the]

2  Agreement."

3       19.     As consideration for Deane's compliance with these covenants, TPFG

4  compensated Deane during his employment, and at termination, agreed to pay Deane a

5  percentage of fees earned and collected by TPFG.

6       20.     Deane's tenure with TPFG qualified him to receive 16 quarterly payments.

7       21.     TPFG terminated Deane's employment on January 22, 2019 without cause and

8  without providing 14 days' notice.

9  **C.**    **Deane's Performance of his Contractual Obligations**

10       22.     During his employment from October 2007 to December 2018, Deane performed

11  his responsibilities, growing the AUM from approximately $18 million in 2007 to over $1

12  billion. Deane did so by developing and maintaining relationships with hundreds of

13  broker/dealers, financial advisors, registered investment advisors, and others.

14  **D.**    **Events Related to Deane's Termination**

15       23.     In early 2018 Meade and Nicholas Scalzo were making a number of structural

16  changes including a realignment of employee responsibilities.

17       24.     On June 15, 2018, Deane received a letter from Meade and Nicholas Scalzo

18  proposing to negotiate a new role for Deane. They offered Deane equity in the company in

19  exchange for cancelling the 2007 Employment Agreement's quarterly termination payment

20  provision.

21       25.     The June 15 offer contained a deadline for acceptance which Deane did not meet.

22       26.     The June 15 offer expired and no contract or understanding as to Deane's role in

23  the firm was reached.

24

27.     Over the next several months from June 2018 to December 2018 the parties continued to meet and negotiate a role for Deane. Multiple proposals were made to Deane and he rejected them.

28.     In November 2018 Meade suggested that Deane take time off and explore other options.

29.     Deane contacted potential other employers and business prospects during this time period.

30.     On December 26, 2018, Deane indicated that he did not want to accept the last proposal from TPFG and wished to accept the June 15, 2018 offer to buy out his 2007 Employment Agreement. This June 15, 2018 offer was no longer a viable offer having expired without acceptance

31.     By late December 2018, the parties were at an impasse.

32.     In January 2019, some portion of Deane's sales territory was reassigned and Deane was made to report directly to Nicholas Scalzo.

33.     Communication between the parties stopped. Deane claimed that he was waiting for direction from TPFG, while TPFG expected Deane to know how to work within the territory now assigned to him.

34.     Deane's work lagged and on January 22, 2019 his employment was terminated.

**E.      Termination Payment Calculation**

35.     During Deane's employment the calculation of his commissions changed over time.

36.     In the beginning, Deane was the only person making sales in his territory and his commission was based upon every sale made in his territory.

37.    As the company expanded, TPFG hired other wholesalers to work portions of Deane's territory. Deane continued to earn a commission based on every sale made in his territory, but Deane paid these additional employees from his commissions. This set up a "cascade" of payments.

38.    As other wholesalers came into the territory, Deane continued to introduce new clients to the wholesalers and maintained his prior contacts, sometimes increasing his old contacts' investments with TPFG.

39.    The territory under Deane's control was successful and AUM expanded.

40.    As new clients were acquired there was no record kept of who made the contact, or who worked on developing or maintaining the relationship.

41.    Depending on the financial product purchased by clients, some of Deane's commissions were paid on a monthly basis and some on a quarterly basis.

42.    Until 2018 the formula for Deane's commission payments was:

    (20% x [Management fees less broker dealer allowances]) - (20% x
    [regional marketing fees for the territory]) = Deane's commission.

43.    Starting in January 2018, the formula for Deane's commission changed so that he was paid 20% of a fraction (.008) of AUM of the accounts within Deane's territory. The formula no longer subtracted marketing fees. The formula was:

    20% x (.008 x [AUM of the accounts within Deane's territory]) = Deane's
    commission.

F.    Definition of "Procured"

44.    Black's Law Dictionary (11th Ed. 2019) defines "procured" as "to initiate a proceeding; to cause a thing to be done; to instigate; to contrive, bring about, effect, or cause."

45.     The American Heritage Dictionary (4th Ed. 2000) defines "procured" as "to get by special effort; obtain or acquire" or "to bring about; effect."

46.     TPFG when calculating the termination payments came up with its own definition of "procured" to be limited to those clients procured by Deane during the time when Deane did not have any other salespeople assisting him in his territory. This excluded any clients added to Deane's territory whenever there were salespeople who Deane supervised.

47.     TPFG's definition cannot be found in any of the contracting agreements or their amendments. Nor is it consistent with how Deane was paid during his employment.

48.     Deane's definition of "procured" would include all clients in his territory as of January 2019 (before his territory was adjusted) unless they had been procured by TPFG prior to when they were assigned to his territory.

49.     TPFG's termination payments deducted marketing expenses. TPFG admitted this was made in error and the amount was repaid to Deane.

50.     According to Deane, TPFG's payment of termination payments to date using TPFG's formula of "procured" has resulted in an underpayment of $892,140.00.

**G.     Salary Calculations**

51.     Deane was terminated on January 22, 2019. He worked 22 of 31 days in January and, pursuant to the 14 days-notice period before termination, he was to be paid wages through February 5, 2019.

52.     Deane calculates that he was owed $115,677 for this period of time.

53.     There is nothing in the Employment Agreement that calls for a prorating of days worked or a percentage of a month worked.

54.     Deane's termination payments were calculated for January and February and he was paid the amounts calculated under TPFG's definition of "procured."

**H.     Future Payments**

55.     The Employment Agreement provides for 16 quarterly payments to Deane as termination payments. Many for the payments must be calculated using data that will only be available in the future.

56.     The numbers and the value of the commission are dependent upon factors which are speculative and volatile, including but not limited to: attrition or addition of clients, stock market volatility, recessions, the impacts of the Covid-19 pandemic, and market changes due to travel restrictions.

**I.     Defendants' Counterclaims**

57.     The Employment Agreement includes a provision restricting Deane's use or retention of "certain information not generally known to the public."

58.     Deane did not share any information belonging to TPFG that was not generally known to the public with any third party.

59.     The testimony of Brian McGinnis is not persuasive to the Court on the issues of solicitation or derogatory remarks. His unexplained anger at being called as a witness, his current negotiation and employment with TPFG, and his vague statements concerning Deane's "hints" at solicitation or inferences of derogatory remarks makes him an unreliable and incredible witness.

60.     Deane did not directly or indirectly solicit the services of any employees or investor clients of TPFG with the purposes of causing such persons to terminate their employment or business relationship with TPFG during the restrictive period.

61.     Deane did not within twelve months of termination or expiration of the employment agreement or any extension thereof or following his termination from TPFG cause, induce, or attempt to cause or induce any of TPFG's custodians, consultants, referral sources or any other business relation of TPFG to cease doing business with it or in any way interfere with the relationship between TPFG and its custodians, consultants, and referral sources.

62.     Commencing on November 16, 2018 and continuing through the termination of his employment without cause on January 22, 2019, Deane initiated inquiries and discussions with third parties about potential employment and business relationship opportunities in the event he could not satisfactorily negotiate his employment relationship with TPFG.

63.     Entering into such inquiries and discussions as Deane initiated was proposed by Meade on November 15, 2018 when she directed him to "explore the space" and look for "a better offer." At no time prior to that date had Deane taken any steps to look for other employment or business relationships.

64.     While Deane was obstinate in his refusal to accept the change in work proposals put forward by TPFG he did not resign his position but simply waited the company out until his termination on January 22, 2019. Each proposal put forward would have resulting in a lowering of his annual income.

65.     While Deane is now working for ACM LLC as of July 2019, the discussion prior to his hiring did not violate the Employment Agreement. There was no proof put forward that ACM was given proprietary information. And the joint venture Deane worked on has yet to be launched.

66.     TPFG has not lost any clients or suffered any loss as a result of Deane's job search activities.

**CONCLUSIONS OF LAW**

1.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 and § 2201(a).

2.     The burden of proof as to the claims and counterclaims is by a preponderance of the evidence

3.     The parties entered into a legally binding contract for Deane's employment in October 2007.

4.     Deane was terminated under the Employment Agreement on January 22, 2019.

5.     Deane is entitled to sixteen quarterly termination payments under the Employment Agreement as a result of the termination of the Employment Agreement.

6.     As to calculating the termination payments, the word "procured" should be given its ordinary meaning: "to initiate a proceeding; to cause a thing to be done; to instigate; to contrive, bring about, effect, or cause," or "to get by special effort; obtain or acquire."

7.     In the context of the Employment Agreement the correct definition of the term "procured" to be used in calculating Deane's termination payments is the same method that was used to pay Deane for his commissions while he was employed with TPFG.

8.     This means the appropriate formula for calculation of Deane's termination payments is: 20% of (.008 x [AUM for all accounts Deane's territory at the time of his termination]). This was the formula the Parties used before the time of termination to calculate Deane's commissions. The territories to be included to calculate the AUM are those that TPFG used in making the partial payments to Deane of his termination payments, and do not reflect changes made to Deane's territories in January 2019. Both the ordinary meaning of the word and the past practice support the proposition that payments are to be made on all accounts in Deane's

1  territory at the time of termination of the Employment Agreement on January 22, 2019

2  regardless of whether another wholesaler was in the region.

3      9.     TPFG has breached the Employment Agreement by failing to pay past amounts

4  correctly owed in the amount of $892,140.00.

5      10.    Future payments are not yet due and owing and will be calculated using the

6  Court's definition of "procured" and the formula for as defined in Paragraph 8 of the

7  Conclusions of Law.

8      11.    Future payments shall be due in quarterly installments as provided for in the

9  Employment Agreement.

10     12.    Deane may ask for an accounting as to any future termination payment. If the

11 payment is found to have been made in error, the costs of the accounting will be borne by TPFG.

12 If the payment is correct, Deane will bear the costs. The Parties are directed to find a mutually-

13 agreed upon accountant to serve in this role. If Deane does not ask for an accounting with 14

14 days of receipt of a payment, this provision is waived as to that payment.

15     13.    No further payments for the dates of January 1 to February 5, 2019 are owed.

16 Deane is made whole through the payment of termination payments through the Court's formula.

17 In other words, any wages due for January 1 to February 5, 2019 have been paid or will be by

18 virtue of the Court's award in this Order.

19     14.    The Court concludes that the dispute concerning wages and termination payments

20 is a "bona fide" dispute. It is "fairly debatable" whether all or a portion of the wages and

21 termination payments must be paid to Deane. See Hill v. Garda CL NW, Inc., 191 Wn.2d 553,

22 562 (2018). The Court further concludes that Defendants had a genuine belief in the dispute and

23 acted on advice of counsel.

24

15.     Errors in the calculation of the termination payments for deductions of the "marketing costs" has been repaid and was the result of an accounting error. That clerical mistake is not a violation of RCW 49.52.050(2). See Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 157 (1998) (holding that "errors in bookkeeping or other acts of accidental character" is not actionable under RCW 49.52.050(2)).

16.     Defendants' counterclaims of constructive resignation, breach of contract—non-solicitation, and breach of contract of the duties of loyalty and confidentiality all fail due to a failure of proof.

17.     Defendants' suspicions of a breach of contract term does not rise to a preponderance of the evidence. The Court concludes that the evidence does not support a claim that private information was disseminated, or that clients and others were solicited. Finally, the Court does not conclude that Deane's job searches or investigation into prospective ventures that have yet to be launched violate the Employment Agreement. At no time between November 15, 2018 and January 22, 2019 did Deane breach any duty of loyalty or violate any fiduciary responsibility by following Meade's instruction to "explore the space." Looking for employment does not in and of itself violate the Employment Agreement.

18.     Judgment shall issue for payment of $892,140.00 against TPFG.

19.     Under Fed. R. Civ. P. 54(d), Deane may file a motion for costs and attorneys' fees pursuant to § 19 of the Employment Agreement.

The clerk is ordered to provide copies of this order to all counsel.

Dated November 25, 2020.

Marsha J. Pechman
United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 13